**IN THE COURT OF APPEALS OF IOWA**

No. 16-1311
Filed September 28, 2016

**IN THE INTEREST OF C.C., D.C.,
M.C., N.C., and S.C.,
Minor children,**

**T.C., Mother,**
Appellant.

_____


Appeal from the Iowa District Court for Polk County, Louise M. Jacobs, District Associate Judge.


A mother appeals from the termination of her parental rights to five of her six children. **AFFIRMED.**


Zachary C. Priebe of Jeff Carter Law Offices, P.C., Des Moines, for appellant mother.

Thomas J. Miller, Attorney General, and Kathrine S. Miller-Todd, Assistant Attorney General, for appellee State.

Erin E. Mayfield of Youth Law Center, Des Moines, guardian ad litem for minor children.


Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**POTTERFIELD, Presiding Judge.**

The mother appeals the termination of her parental rights to five of her six children.[1] At the time of termination, the children at issue ranged in age from four to ten years old. The mother's parental rights were terminated to each child pursuant to Iowa Code section 232.116(1)(f) (2015). She maintains the State has not made reasonable efforts—in consideration of her intellectual disability— to reunify her with the children. For this reason, she maintains the State has not proved by clear and convincing evidence that the children could not be returned to her care at the time of the termination hearing. *See* Iowa Code § 232.116(1)(f)(4). Additionally, she challenges whether termination was in the best interests of the children and whether a permissive factor should have prevented the court from terminating her parental rights. *See id.* § 232.116(2), (3).

**I. Background Facts and Proceedings.**

The Iowa Department of Human Services (DHS) and the juvenile court have been involved with this family in the past. Before this case began, DHS had filed at least two founded reports of the mother's denial of critical care, and child-in-need-of-assistance (CINA) proceedings were initiated in 2011.

DHS became involved the present time in early 2015 after receiving reports the youngest child, then three years old, was outside wandering alone while wearing only a diaper (in winter) and the children were begging the neighbors for food. Further investigation showed the family's home was infested with cockroaches and rodents; the children were found to be suffering from open

---

[1] The father's parental rights were also terminated. He does not appeal.

sores on their heads due to long-term issues with lice. DHS noted the mother presented as lower functioning and could benefit from adult services.

The children were removed from the mother's care on April 27, 2015. Soon thereafter, they were adjudicated CINA. At the CINA hearing, the mother denied that she had not provided the children with adequate food or that the children had asked the neighbors for food. A DHS worker had noted the lack of edible food in the home and mold growing in the family's refrigerator; the mother maintained the family had been eating out. The court found this testimony was not credible.

The mother completed an IQ evaluation during the pendency of the case. The clinical psychologist who completed the evaluation found that the mother performed in the "extremely low range of functioning overall" and opined she would "need repetition in learning to benefit from" DHS's involvement. The psychologist also noted the mother "may function at a higher level than her IQ score [58] indicates given that she is able to hold down a job and has limited educational exposure[2]."

In an August 2015 report to the court, the social worker noted that there were concerns regarding whether a couple of the children were behind developmentally. Additionally, the nine-year-old was known to have BM accidents. The child saw a doctor and was given a prescription to prevent constipation. After being told he would be responsible for cleaning himself after any such accidents, the child stopped having accidents while with the foster

---

[2] It is unclear from the record how much formal education the mother has received; at different places in the record it appears she reported she attended school through fourth, eighth, and ninth grades. The mother has not obtained a GED.

family. However, he continued to have them during visits with the mother. Those also stopped once the family safety, risk, and permanency (FSRP) service provider prevented the mother from helping him clean himself. The mother was told to schedule dentist appointments for each of the children, but she did not do so. The foster families took the children to the dentist, who noted the children had not received dental care since the last time DHS was involved with the family, in 2011. Many of the children had cavities. The caseworker also noted that the mother had been telling the oldest child—to whom the mother's rights have not been terminated—to lie to the department and providers.

In DHS's January 2016 report to the court, the caseworker noted the children were all doing well in their two separate placements. They had recently seen the dentist, doctor, and optometrist; the mother did not attend any appointments due to her work schedule. Additionally, the seven-year-old and three-year-old daughters had both recently exhibited some signs of sexualized behavior, and that information was given to their therapists. The nine-year-old had recently told her therapist about a time when a man had touched her inappropriately in the pool. She stated that when she told her mother about it, the mother told her "that couldn't have happened because he's too tall." The caseworker also noted that the mother was eligible for adult services and financial support due to her intellectual disability. Although the mother did not believe she was in need of adult services, the FSRP provider and the mother were working together to start the process of providing her those services. The mother had recently completed a parenting class. However, it was noted the mother continued to have adult conversations in front of the children—for

example, telling them that the FSRP provider was being mean to her when she was redirected and expecting the children to come to her defense.

On March 1, 2016, the mother filed a motion requesting a reasonable-efforts hearing and services. She maintained that she not been provided services to address her level of cognitive functioning; although referrals had been made, no services were in place. She requested "services to assist her with social, conceptual, and practical skills that [would] assist her in providing stability for her children." The State resisted, noting that the court had found reasonable efforts were being provided as recently as February 2. Additionally, the State listed the services that the FSRP provider was attempting to help the mother obtain and steps that were being taken due to the mother's functioning ability, such as providing repetitive notes or directions regarding parenting skills before and after visits.

The court scheduled a hearing on the matter to coincide with the permanency hearing scheduled for April 15. Following the hearing, in its written order, the court provided an extensive list of services that had been offered to the family. Although the mother's new home was clean and large enough for the children—a two-bedroom duplex she had recently begun renting—there were not enough beds for the children and the mother had no plan for their supervision during her long work hours. The permanency goal was changed to termination of the mother's parental rights.

In a June report to the court, the caseworker noted that the mother was still having trouble supervising all of the children at once. Additionally, the mother was only receiving two supervised visits per week with the children.

[The mother] continues to be inappropriate and have adult conversations with and around her children. Also, for most of the case, [the mother] did not have safe and appropriate housing to have visits. The visits have been happening at the library or a public park. [The mother] could not identify appropriate relatives or friends that could help with supervision or transportation at any time throughout the case. When [the mother] was asked about increasing her visits, she refused times that were offered to her because of her work schedule.

The mother had been employed during most of the proceedings, but she had switched jobs several times. At the time of the termination hearing, she was doing restaurant work with long hours. She also had been evicted from multiple residences and had "bounced" between staying with several of her relatives. She reported she was renting a two-bedroom home that was appropriate for her and the children, but there were questions regarding if she had a roommate and where all the children would sleep if they were returned to her. Additionally, the mother had been arrested for driving while barred during the pendency of the proceedings, and she admitted to the caseworker that she continued to drive without a license. The mother blamed her previous neighbors for DHS's involvement with the family—failing to recognize the gravity of the home situation. The children were well-bonded with their foster families and both sets of foster parents were willing to adopt the children in their care.

The termination hearing took place on July 12, 2016. The FSRP worker testified that the mother had not yet received any adult services, although she had completed a parenting class. The mother continued to show resistance when redirected by the FSRP provider, and although at one point she admitted the issues with the family's living conditions when DHS became involved, she had reverted back to denying there had been an issue warranting intervention.

The mother was eligible for Social Security disability due to her intellectual disability, but she was currently earning too much at her job to qualify. The mother testified her work hours varied, but she often went to work at 11:30 a.m. and did not return until 10:00 pm. She did not provide testimony about who would care for the children if they were returned to her. The caseworker and the guardian ad litem recommended termination of the mother's parental rights.

The juvenile court terminated the mother's parental rights to each of the five children pursuant to Iowa Code section 232.116(1)(f).

The mother appeals.

## II. Standard of Review.

We review termination proceedings de novo. *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000).

## III. Discussion.

The mother maintains DHS needed to go to greater lengths to provide her services on account of her intellectual disability to fulfill the reasonable-efforts mandate. *See* Iowa Code § 232.102(7) (requiring DHS to make "every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interests of the child"). "[T]he reasonable efforts requirement is not viewed as a strict substantive requirement of termination." *C.B.*, 611 N.W.2d at 493. Rather, as part of its ultimate proof, the State must establish that it made reasonable efforts to return the children to the children's home. *Id.* "[T]he scope of the efforts by the DHS to reunify parent and child[ren] after removal impacts the burden of proving those elements of termination which

require reunification efforts." *Id.* We determine whether reasonable efforts have been made "on a case-by-case basis." *See* Iowa Code § 232.102(5)(b).

All parties agreed the mother could benefit from voluntary services, but the mother was never able to begin the services due to lack of funding and long waitlists. DHS tried to get the mother the services, but DHS and the mother were informed that because she did not have a dual diagnosis—involving mental health issues and being low functioning—there were limited services available. The mother was referred to therapy in order to see if a diagnosis would be made. The mother's therapist referred her to Community Support Services, which provided an array of services, such as "assessment and service planning, monitoring of mental health symptoms, medication management, personal support and problem solving assistance, development and use of natural supports, and coordination of appointments and transportation." Additionally, the FSRP provider continued to reach out to other organizations to see if they had programs or could make referrals to benefit the mother. The FSRP worker helped the mother with her paperwork to obtain Social Security disability payments, and she continued to provide the mother repetition on parenting skills on the drives to and from visits.

While the mother likely would have benefitted from additional services, we cannot determine DHS failed to take advantage of available services for her on this record. We understand the mother's frustration, but we disagree with her claims that DHS did nothing more than give her a referral and leave her to fend for herself.

Additionally, we note the juvenile court's uncertainty regarding the mother's receptiveness to such services. At the time of the termination hearing, the mother failed to recognize the severity of the issues that caused DHS's intervention, and she was not receptive to suggestions or directions given by the FSRP provider. As the court stated:

> While many challenges for [the mother] might be related to her intellectual disability, her lack of truthfulness and her denial of the problems present are likely not directly related to her disability but rather related to her resistance to change. [The mother] does not demonstrate an interest in changing. That is [the mother's] biggest hurdle . . . .

Considering the facts of this case and the efforts made by DHS, we believe the State made reasonable efforts to reunite the mother with her children.

Because the State made reasonable efforts and the children were not able to be returned to their mother's care at the time of the termination hearing, the statutory ground for termination pursuant to section 232.116(1)(f) has been met.

The mother maintains termination of her parental rights is not in the children's best interests. *See* Iowa Code § 232.116(2). She maintains that the children, who were placed with two separate foster families, should not be split up and that not terminating her rights is the way to achieve this end. We acknowledge that siblings should be kept together when possible. *See In re L.B.T.*, 318 N.W.2d 200, 202 (Iowa 1982). However, here, we believe termination of the mother's parental rights is still in the children's best interests. Two of the siblings have been placed with one pre-adoptive family while the other three have been placed with another. All five of the children are bonded with their respective foster parents, and each child is healthier and doing better in

school than they were when DHS intervened. Moreover, all five siblings were having "sibling visits," and they remained a part of each other's lives. Although the mother believes she could parent all five of the children, the mother had not demonstrated that she could supervise and care for all of the children together.

The mother maintains the permissive factor in section 232.116(3)(c), the closeness of the parent-child relationship, weighs against the termination of her parental rights. It is clear the mother and children love each other and are bonded with each other, but "our consideration must center on whether the child will be disadvantaged by termination, and whether the disadvantage overcomes [the parent's] inability to provide for [the child's] developing needs." *In re D.W.*, 791 N.W.2d 703, 709 (Iowa 2010). On our de novo review, we find the children's need for permanency and stability outweighs the possible harm from the termination of the mother's parental rights; no permissive factor weighs against termination.

For the foregoing reasons, we affirm the juvenile court's termination of the mother's parental rights to each of the five children.

**AFFIRMED.**